**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DEVONNE PETAWAY,**

    **Petitioner,**                              **CASE NO. 2:10-CV-533
                                               JUDGE MARBLEY**
    **v.**                                        **MAGISTRATE JUDGE KING**

**WANZA JACKSON, WARDEN,**

    **Respondent.**

### REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the petition, Doc. No. 4, Respondent's return of writ, Doc. No. 8,  Petitioner's traverse, Doc. No. 18,  and supplemental traverse, Doc. No. 19,  and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

### FACTS and PROCEDURAL HISTORY

The Ohio Third District Court of Appeals summarized the facts and procedural history of this case as follows:

> In February 2008, the Logan County Grand Jury indicted Petaway on one count of aggravated burglary in violation of R.C. 2911.11(A)(2), a felony of the first degree, with a firearm specification under R.C. 2929.14(D)(1)(a)(ii); one count of aggravated robbery in violation of R.C. 2911.01(A)(1), a felony of the first degree, with a firearm specification under R.C. 2929.14(D)(1)(a)(ii); one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree, with a firearm specification under R.C. 2929.14(D)(1)(a)(ii); one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree; and, one count of having a weapon while under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree. The indictment arose from an incident during which it was alleged that Petaway pushed his way into a home, brandished a

firearm, demanded money, pointed the firearm at a child, struck a woman with the firearm, and fired shots at a man who attempted to flee the home. Subsequently, Petaway entered a plea of not guilty as to all counts in the indictment.

In August 2008, the case proceeded to trial at which the following testimony was heard.

Tisha Lyburtus, the female victim, testified that, in January 2008, she lived at 313 South Park Street in Bellefontaine; that, on January 10, 2008, she and her boyfriend, Keith Brown, her son, Aurelio Lyburtus, and her two nephews, Skylar Rogan and Desmond Lyburtus, were at her home; that Brown and the boys were playing video games in the living room of the home while she was in the kitchen; that she heard a loud bang at the door and Brown went to see who it was; that she heard someone yell "[g]et the fuck on the floor, [g]et down and give me your money" (trial tr., p. 132); that she saw Petaway with a gun; that she recognized Petaway because he had dated her cousin, Kyna Brown; that Petaway told her to "shut up" and "get the fuck on the floor," so she cradled Aurelio and Skylar in her lap on the floor while Desmond remained on the couch (trial tr., p. 133); that a tall white man held a knife against Brown and told him to empty his pockets; that Petaway pushed Desmond up against the couch and pressed the gun against his eye; that she asked Petaway to leave the child alone, and he replied "[s]hut the fuck up, bitch" and struck the back of her head with the gun (trial tr., p. 137); that he then hit her hand with the gun as she attempted to block him; that she did not see Petaway or the white man take any money, but she believed they took $40 because it was missing; that Brown told the men that he had some money outside in his truck, feigned reaching for his keys, knocked the white man out of the way, and ran out the front door; that both the white man and Petaway ran after Brown, and Petaway stood in the doorway and fired shots at Brown; that she heard several more gunshots as she barricaded herself and the children in a bathroom and called 9-1-1; and, that medical personnel called to the scene recommended she go to the hospital to receive further medical treatment, but that she did not go to the hospital because she was concerned about the children.

Keith Brown testified that he was present during the incident at Lyburtus' home; that he was playing video games with Lyburtus' son and nephews when he heard someone bang on the door; that three

2

men "barged" their way into the home and demanded money; that the tall white man backed him into a corner and held a knife against him; that he recognized one of the other men as Petaway because Petaway had dated Lyburtus' cousin, Kyna Brown; that Petaway yelled at everyone inside the home to get down; that Petaway hit Lyburtus in the head with a gun; that Petaway held a gun to Desmond's eye; that he told the men that his money was in his truck and was able to push the white man out of the way and run out the door; that Petaway fired four or five shots at him as he ran; and, that he was not hit by any of the shots.

The trial court conducted an in-chambers voir dire examination of Skylar, during which Skylar stated that he turned eleven years old on July 30, 2008; that he believed he was present in court because he "was staying at his cousin's house and [they] got robbed" (trial tr., pp. 177-78); that he could not remember how to recite the Pledge of Allegiance; that he did not know what happened to people who did not tell the truth; that he had been around people who had been caught telling a lie, and they got into trouble; that a lie is "where someone don't tell the truth"; that he thought he would be punished if he did not tell the truth; that, if he was asked to tell the truth, he would do it because he would not want to get in trouble; and, that lying is bad. Thereafter, Petaway objected to Skylar's testimony on the basis of competency due to his age, which the trial court overruled.

Skylar testified at trial that, on the night of the incident, he was playing video games with his cousins when they heard someone knock on the door; that, when Brown attempted to open the door, a white man and a black man kicked down the door and the black man held a gun to Desmond's eye; that he sat on the floor with Aurelio and Lyburtus; that Lyburtus told the black man, "please don't kill my nephew," and the man hit her in the back of the head with the gun; that the white man had a knife in his hand and was in the corner with Brown; that Brown pushed the white man aside and ran outside; that the black man started shooting and ran outside; and, that Lyburtus put the boys in the bathroom while she called the police.

The trial court conducted an in-chambers voir dire examination of Aurelio, during which he stated that he turned eleven years old on July 29, 2008; that he believed "to tell the truth" means "to be honest"; that it is a bad thing to lie, and people usually get in trouble

for lying; and, that it is important to tell the truth. Thereafter, Petaway objected to Aurelio's testimony on the basis of competency due to his age, which the trial court overruled.

Aurelio testified at trial that, on the night of the incident, he was playing video games with his cousins; that a black man and a white man "busted in the door" (trial tr., p. 222); that the white man had a knife and held Brown in a corner; that the black man held a gun and put it on Desmond's face; that the black man hit Lyburtus on the back of the head and on the knuckle with the gun; that Brown pushed the white man and ran out the door; that the black man started shooting and ran outside along with the white man; that Lyburtus put the boys in the bathroom; and, that he had seen the black man before and recognized him as Petaway.

The trial court conducted an in-chambers voir dire examination of Desmond, during which he stated that he turned nine years old on July 14, 2008; that "if you lie to your parents and your parents find out you're going to get in trouble, but if you tell the truth you're probably not going to get in trouble" (trial tr., p. 205); and, that he would be willing to tell the truth under any circumstances. Thereafter, Petaway objected to Desmond's testimony on the basis of competency due to his age, which the trial court overruled.

Desmond testified at trial that, on the night of the incident, he was playing video games with his cousins; that a white man and a black man knocked on the door and then "started busting in" (trial tr., p. 231); that the men told everyone to get down on the floor, but he remained on the couch; that the white man had a knife and pushed Brown against a wall; that the black man put a gun against his face and he was scared; that the black man hit Lyburtus on the back of the head with the gun; that Brown pushed the white man and ran outside; that the black man ran to the door and started shooting and chasing Brown; and, that Lyburtus put the boys in the bathroom and called the police.

Patrol Officer Dennis McBrien of the Bellefontaine Police Department testified that, on January 10, 2008, he was dispatched to a robbery in progress at 313 South Park Street in Bellefontaine, Logan County; that Lyburtus, Aurelio, Desmond, and Skylar were at the residence and were very distraught; that Lyburtus' head was

4

bleeding; that Lyburtus identified the black male perpetrator as Petaway; that Lyburtus stated that the other perpetrator was a tall, thin, white male; and, that he discovered a spent bullet across the street on the sidewalk.

Benjamin Kennedy of the Bellefontaine Fire Department testified that he is a firefighter/paramedic; that, on January 10, 2008, he treated Lyburtus in the back of an ambulance for a head injury and a hand injury; that Lyburtus had an abrasion on her head that was bleeding and swollen and an abrasion on her hand; that Lyburtus refused to go to the hospital; and, that Lyburtus stated she was injured when she was struck with a gun.

Officer Craig Comstock of the Bellefontaine Police Department testified that he participated in the investigation of the incident; that he received a report that the suspects were running westbound so he began to patrol the area; that he saw a tall, white male running westbound throw an object onto the ground in a parking lot; that the man was running toward a bar called "Sandy's Outlaws"; and, that he discovered a black nine-millimeter magazine and one nine-millimeter round laying on the ground where the man had thrown the object.

Detective Scott Sebring of the Bellefontaine Police Department testified that he processed the crime scene; that he discovered one spent bullet and three empty shell casings; that the empty shell casings were located on the sidewalk, the steps of the porch, and across the street; that, at Sandy's Outlaw's, he discovered the tall, white man, Jason Mahe, and a knife hidden inside a pool table at the bar; that he eventually learned that Petaway, Colby Harris, and Matt Haley were also involved in the crime; that he arrested Harris and Haley on January 12, and both admitted that they were at 313 South Park Street during the time of the shooting, but claimed that they never entered the residence; that Haley told him that, after the incident, he and Petaway buried the nine-millimeter firearm; that Haley directed them to where they could find the firearm, which they located; that they did not request the crime lab to process latent prints on the firearm because the powder used to lift latent prints can interfere with marks on the casings, because DNA testing on the firearm cannot be done without DNA from a suspect, which they did not have at the time, and because they knew that Haley had also touched the firearm, which could interfere with DNA testing; and, that they did not apprehend Petaway the night of the incident, but

approximately ten days later.

Detective Dwight Salyer testified that he discovered Petaway had purchased a bus ticket to Indianapolis under an alias on January 12, 2008, where he was eventually apprehended.

James Smith, a forensic scientist at the Bureau of Criminal Identification and Investigation, testified that he performed analysis of evidence from the incident; that he examined the nine-millimeter firearm; and, that, in his expert opinion, the three empty shell casings or cartridge cases discovered at the scene were fired from the recovered firearm.

Colby Harris testified that, on January 10, 2008, he was at a bar with Mahe, Haley, and Petaway, and they discussed robbing Brown; that Mahe is a tall, white man; that the men went to Brown's home where he and Haley stood by the side of the house, and Mahe and Petaway walked up to the door; that he heard screaming inside the house and saw Brown run outside; that he saw a flash from a gun and he and Haley ran away; that he heard five or six shots fired; and, that he did not know who fired the gun, but it was either Petaway or Mahe.

Matthew Haley testified that, on January 10, 2008, he was at a bar with Petaway, Harris, and Mahe; that the men decided to rob Brown; that the men retrieved his nine-millimeter firearm; that Petaway took the firearm and carried it all the way from his house to Brown's house; that Mahe had a knife with him and carried an extra magazine for the firearm; that he and Harris stayed on the side of the house in the alley, and Petaway and Mahe went up to the house and "rushed" in; that he heard yelling and saw Brown run outside; that Petaway ran behind Brown, shooting at him; and, that he retrieved the firearm and buried it the next morning.

Jason Mahe testified that he was involved in the incident; that he had a knife and a firearm during the incident; that the men went to Brown's house to rob him; that he and Petaway went up to the door; that Mahe, Petaway, Haley, and Harris all rushed into the house; that he held Brown in the corner with a knife; that Petaway was holding and pointing a firearm inside the home; that he did not realize children were in the house until he heard them screaming; that he

6

> demanded money from Brown; that he stole "money and dope" from Brown's sock; that Brown told him the rest of the drugs were in his vehicle and ran outside; that he and Petaway chased Brown and Petaway fired about four shots at Brown; and, that he went to Sandy's Outlaws and threw an extra clip for the nine-millimeter firearm under a car.
>
> Kyna Brown, Lyburtus' cousin, testified that she had previously dated Petaway; that she saw Petaway the evening of the incident; and, that he was breathless and told her that he hoped he had not hurt Brown.
>
> Additionally, the parties stipulated that Petaway had been convicted of drug possession in 2004, which prohibited him from possessing a firearm under R.C. 2923.13(A)(3).
>
> Thereafter the jury returned a verdict finding Petaway guilty of aggravated burglary with a firearm specification; aggravated robbery with a firearm specification; felonious assault with a firearm specification; abduction with a firearm specification; and one count of having a weapon while under disability.
>
> In September 2008, the trial court sentenced Petaway to an eight-year prison term on the aggravated burglary conviction with a mandatory three-year prison term on the firearm specification; to a seven-year prison term on the aggravated robbery conviction with the firearm specification merging; to a six-year prison term on the felonious assault conviction with the firearm specification merging; and, to a one-year prison term on the weapons under disability conviction. Additionally, the trial court merged the abduction conviction with the aggravated robbery conviction. Finally, the trial court ordered that all sentences be served consecutively to each other and to the three-year firearm specification, for an aggregate twenty-five year prison term.

*State v. Petaway*, 2009WL73772, at *1-5 (Ohio App. 3rd Dist. March 23, 2009). Petitioner filed a timely appeal, in which he raised the following assignments of error:

> Assignment of Error No. I
>
> THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT IN ALLOWING THE TESTIMONY OF

> CHILDREN 10 YEARS AND UNDER AT THE TRIAL WHERE THEIR COMPETENCY IS SUSPECT IN THAT THE CHILDREN DID NOT APPEAR CAPABLE OF RECEIVING JUST IMPRESSIONS OF THE FACTS AND TRANSACTIONS RESPECTING WHICH THEY ARE EXAMINED, OR OF RELATING THEM TRULY IN VIOLATION OF RULE 601 AND 403 OF THE OHIO RULES OF EVIDENCE, THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION.
>
> Assignment of Error No. II
>
> THE DEFENDANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

*See id.* On March 23, 2009, the appellate court affirmed the trial court's judgment. *Id.* Petitioner never filed an appeal to the Ohio Supreme Court.

On June 19, 2009, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). He asserted that he had been denied the effective assistance of appellate counsel because that attorney failed to raise on appeal claims based on an alleged denial of Petitioner's right to a speed trial. *Exhibit 10 to Return of Writ.* On July 30, 2009, the appellate court denied Petitioner's Rule 26(B) application because his filing exceeded the ten page limitation under Rule 26(B)(4) and because Petitioner failed to raise a genuine issue of ineffective assistance of appellate counsel. *Exhibit 11 to Return of Writ.* On November 18, 2009, the Ohio Supreme Court dismissed Petitioner's subsequent appeal as not involving any substantial constitutional question. *Exhibit 14 to Return of Writ.*

On June 10, 2010, Petitioner filed the *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that he is in the custody of the Respondent in violation of the Constitution of the United States based upon the following grounds:

8

> 1. Appellant['s] const[itutional] right to due process was violated when the trial courts failed to have appellant tried and convicted within his 90 day statutory speedy trial limitation, and not stating reasons by journal entry explaining to appellant why his jury trial was scheduled outside his 90 day speedy trial limitation and took place well outside his 90 day speedy trial limitation.
>
> 2. Appellant['s] const[itutional] right to a speedy trial was violated when the trial courts failed to have appellant tried and convicted within appellant['s] 90 day statutory speedy trial limitations, records will reflect appellant never waived his const[itutional] speedy trial rights.
>
> 3. Appellant was denied his const[itutional] right to effective assistance of trial counsel when trial counsel failed to file a motion to have the indictment dismissed on the grounds that the prosecution failed to timely prosecute.
>
> 4. Appellate counsel failed to raise Petitioner's const[itutional] right to due process/speedy trial/ineffective assistance of trial counsel in Petitioner['s] direct appeal.

It is the position of the Respondent that Petitioner's claims are waived or without merit.

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual

9

prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.*

In claims one, two and three, Petitioner asserts that he was denied his right to a speedy trial and denied the effective assistance of trial counsel because his attorney failed to file a motion to dismiss the indictment on speedy trial grounds. These claims, being readily apparent from the face of the record, should have been raised on direct appeal, but were not. Further, Petitioner may now no longer present these claims to the state courts under Ohio's doctrine of *res judicata*. *See State v. Cole,* 2 Ohio St.3d 112 (1982); *State v. Ishmail,* 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967). The state courts were never given an opportunity to enforce the procedural rule at issue due to the nature of Petitioner's procedural default.

Further, the State of Ohio has a procedural rule that requires that claims be raised on direct

appeal, if possible, or they will be barred by the doctrine of *res judicata.* The Court finds that Ohio's *res judicata* rule is adequate and independent under the third part of the *Maupin* test. To be "independent," the procedural rule at issue, as well as the state courts' reliance thereon, must rely in no part on federal law. *See Coleman v. Thompson,* 501 U.S. 722, 732-33 (1991). To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia,* 498 U.S. 411 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id.* at 423 (quoting *James v. Kentucky,* 466 U.S. 341, 348-351 (1984)); *see also Barr v. City of Columbia,* 378 U.S. 146, 149 (1964); *NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 297 (1964); *see also Jamison v. Collins,* 100 F.Supp.2d 521, 561 (S.D. Ohio 1998).

The Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e.,* the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir.2006); *Coleman v. Mitchell,* 268 F.3d 417, 427-29 (6th Cir.2001); *Seymour v. Walker,* 224 F.3d 542, 555 (6th Cir.2000); *Byrd v. Collins,* 209 F.3d 486, 521-22 (6th Cir.2000); *Norris v. Schotten,* 146 F.3d 314, 332 (6th Cir.1998). Ohio courts have consistently refused, in reliance on the doctrine of *res judicata,* to review the merits of claims because they are procedurally barred. *See State v. Cole,* 2 Ohio St.3d at 112; *State v. Ishmail,* 67 Ohio St.2d at 16. Additionally, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Court concludes that *res judicata* does not rely on or otherwise implicate federal law. Accordingly, this Court is satisfied from its own review of relevant case law that the *Perry* rule is an adequate and independent ground for denying relief. Petitioner has waived claims one through three for federal habeas corpus review.

11

Petitioner may still obtain review of the merits of these claims if he establishes cause for his procedural default, as well as actual prejudice from the alleged constitutional violations. As cause for his procedural default and in claim four of his habeas corpus petition, Petitioner asserts the ineffective assistance of appellate counsel. This claim may constitute cause for Petitioner's procedural default, so long as the claim has been presented to the state courts and is not itself procedurally defaulted. *See Edwards v. Carpenter,* 529 U.S. 446, 451 (2000) (citing *Murray v. Carrier,* 477 U.S. at 488-89.

The state appellate court rejected Petitioner's claim of ineffective assistance of trial counsel in relevant part as follows:

> Upon consideration the court finds that the application fails to comply with App.R. 26(B)(4), stating that an application shall not exceed ten (10) pages in length.
>
> The court further finds that, in addition to the procedural defect, the two assignments of error raised in the application do not give rise to a "genuine issue" as to whether Appellant was deprived of the effective assistance of appellate counsel under the two-prong analysis of *Strickland v. Washington* (1984), 466 U.S. 669. . . . For these reasons, the application for reopening is not well-taken.

*Exhibit 14 to Return of Writ.*

Respondent contends that, in view of the state appellate court's rejection of Petitioner's Rule 26(B) application for failing to comply with the ten day page limitation, Petitioner has thereby waived his claim of ineffective assistance of appellate counsel; the alleged ineffective assistance of appellate counsel cannot, therefore, constitute cause for Petitioner's procedural default of claims one through three. *See Return of Writ*. In response, Petitioner argues that he had less than sixty days to file his Rule 26(B) application and, that during that time, he was unable to obtain access to the

prison's law library.[1] *See Traverse*. The Court need not consider this issue because, as also noted by Respondent, Petitioner's claim that he was denied his right to a speedy trial is plainly without merit; his trial and appellate counsel were therefore not ineffective for failing to assert that claim. It follows that his claims of ineffective assistance of counsel fail the two-prong *Strickland* test.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. at 687; *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 697. Because

---

[1] Petaway's *pro se* status and claimed ignorance of the law and procedural requirements for filing a Rule 26(B) application, and alleged limited access to the prison's law library, are insufficient grounds to establish cause for his procedural default. *See Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).

13

petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id.,* at 697.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic. The United States Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

> A. Were the omitted issues "significant and obvious?"
> B. Was there arguably contrary authority on the omitted issues?
> C. Were the omitted issues clearly stronger than those presented?
> D. Were the omitted issues objected to at trial?
> E. Were the trial court's rulings subject to deference on appeal?
> F. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> G. What was appellate counsel's level of experience and expertise?
>
> H. Did the petitioner and appellate counsel meet and go over possible issues?
> I. Is there evidence that counsel reviewed all the facts?
> J. Were the omitted issues dealt with in other assignments of error?
> K. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir.1999).

Under O.R.C. § 2945.71, a person charged with a felony who is being held in custody must be brought to trial within ninety days of his arrest:

> (C) A person against whom a charge of felony is pending:
>
> (2) Shall be brought to trial within two hundred seventy days after his arrest.
>
> ***
>
> (E) For purposes of computing time under division[] (C)(2) . . . of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days. . . . .

Certain periods, however, are excluded from this time computation:

> The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:
>
> (A) Any period during which the accused is unavailable for hearing or trial, by reason of other criminal proceedings against him, within or outside the state, by reason of his confinement in another state, or by reason of the pendency of extradition proceedings, provided that the prosecution exercises reasonable diligence to secure his availability;
>
> (B) Any period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined, or any period during which the accused is physically incapable of standing trial;
>
> (C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law;
>
> (D) Any period of delay occasioned by the neglect or improper act of the accused;
>
> (E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;
>
> (F) Any period of delay necessitated by a removal or change of venue pursuant to law;
>
> (G) Any period during which trial is stayed pursuant to an express statutory requirement, or pursuant to an order of another court

>competent to issue such order;
>
>(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion;
>
>(I) Any period during which an appeal filed pursuant to section 2945.67 of the Revised Code is pending.

O.R.C. § 2945.72.

Petitioner was arrested on January 16, 2008. *Exhibit 10 to Return of Writ*, p.8. His arraignment was continued from January 29, 2008, to January 31, 2008, at Petitioner's own request. *Exhibit 18 to Return of Writ*. On March 11, 2008, Petitioner's attorney filed a motion to withdraw citing a conflict of interest. *Exhibit 20 to Return of Writ*. The trial court held a hearing on that motion and, on March 14, 2008, appointed the public defender to represent Petitioner. Based on Petitioner's own motion, the trial court continued the scheduling conference from March 17, 2008, to March 24, 2008. *Exhibit 21 to Return of Writ*. On that date, and in Petitioner's presence via speaker phone, the trial date was scheduled for July 1-3, 2008, based on the schedules of the trial court and defense counsel. *Transcript,* March 24, 2008. On July 1, 2008, Petitioner requested a continuance of the trial date to August 18-20, 2008. *Exhibit 22 to Return of Writ*.

Construing this record in the light most favorable to Petitioner, and assuming that his speedy trial clock ran from January 17, 2008 (the day after his arrest) until March 24, 2008 (the date of the scheduling conference) – or for a period of 67 days – the record still fails to document that Petitioner was denied his right to a speedy trial under Ohio law. The July 1, 2008 trial date set at the March 24, 2008 scheduling conference extended beyond the expiration of the ninety day period, but that date was set with the agreement of defense counsel, taking into consideration the schedules of Petitioner's attorneys and the trial court. *See Transcript,* March 24, 2008. This period of time

is therefore excluded from the speedy trial clock. *See* O.R.C. § 2945.72(H); *State v. McRae*, 55 Ohio St.2d 149, 152 (1978)(citing *State v. Davis*, 46 Ohio St.2d 444 (1976))(trial court has discretion to extend time limits of O.R.C. § 2945.71 where counsel for the accused voluntarily agrees to trial date beyond statutory time limits). Petitioner's arguments that the State nonetheless violated his right to a speedy trial because he did not execute a written waiver of his right to a speedy trial, or because the trial court failed to journalize its reasons for the continuance, are not persuasive in view of Ohio law. *See id.* Similarly, Petitioner's attorney again requested a continuance of the trial date from July 1, 2008, to August 18-20, 2008. *Exhibit 22 to Return of Writ*. This period of time likewise does not count against the State. O.R.C. § 2945.72(H).

Moreover, the record also fails to reflect that Petitioner's right to a speedy trial under the Sixth Amendment was violated. In considering whether a defendant's Sixth Amendment right to a speedy trial has been violated, a court must conduct a balancing test weighing the following four factors: 1) the length of the delay; 2) the reason for the delay; 3) the defendant's assertion of his right; and 4) prejudice to the defendant. *Doggett v. United States*, 505 U.S. 647, 651 (1992); *Barker v. Wingo* 407 U.S. 514, 530 (1972). The length of the delay for speedy trial purposes is measured from either the date of the indictment or the date of the arrest, whichever is earlier. *Cain v. Smith,* 686 F.2d 374, 381 (6th Cir.1982). The delay must be presumptively prejudicial before a court is required to inquire into the other factors of the balancing test. *Barker,* 407 U.S. at 530. Whether the delay is presumptively prejudicial is determined by the nature and complexity of the crime. *Redd v. Sowders*, 809 F.2d 1266, 1269 (6th Cir.1987). The more serious the crime, the shorter the toleration of delay. *Id.*

Here, approximately seven months elapsed between the date of Petitioner's arrest (January

17

16, 2008), and his trial date (August 18, 2008). This time period was not presumptively prejudicial so as to require further inquiry into the remaining factors under *Barker*. *See Doggett v. United States*, 505 U.S. at 652, n.1 (noting that most courts have found presumptively prejudicial delay as the delay approaches one year); *see also United States v. Jackson*, 473 F.3d 660, 665 (6th Cir. 2007)(citations omitted). In any event, consideration of the remaining factors under *Barker, i.e.*, reasons for the delay (schedules of defense counsel, preparation for trial), Petitioner's apparent consent to the delay and failure to assert his right to speedy trial, in combination with the absence of any indication of prejudice – persuades this Court that Petitioner was not denied his federal constitutional right to a speedy trial.

Thus, Petitioner's appellate counsel was not ineffective under *Strickland* for failing to raise a claim based on the denial of a speedy trial. Petitioner's claim four is therefore without merit. Moreover, it follows that Petitioner has failed to establish cause for his procedural default of claims one through three..

**WHEREUPON,** the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

**PROCEDURE ON OBJECTIONS**

If any party objects to this *Report and Recommendation,* that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in

part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

    *s/ Norah McCann King*
Norah McCann King
United States Magistrate Judge

September 21, 2011